May it please the Court, my name is Audra Goodman. We're getting signals from outer space. We're getting a buzz out of this. I think it's just interfering with the microphone maybe. Try it. Okay. May it please the Court, my name is Audra Banan. I'm representing the petitioner in this matter. The petitioner is a citizen and national of Armenia who entered the United States in October 1999 with a visitor's visa, and she's seeking relief of asylum, withholding of removal, and relief under Article III of the Convention Against Torture. In Armenia, a petitioner was a journalist who worked for a newspaper and freelanced for television and radio, and two of petitioner's stories are at issue in her asylum claim. The first story, a petitioner had accused government officials of misappropriating money that was earmarked for an orphanage, and then the second story regarded military hazing. The facts of the asylum claim are lengthy and due to time constraints, so I won't go into them in detail. However, the facts have been laid out in detail in both briefs. I would like to go just to the heart of the issues. The immigration judge held that petitioner lacked credibility. Specifically, portions of her story were implausible. However, I do not believe the issue here is credibility. I believe the issue here is due process. Specifically, whether petitioner was afforded a fair hearing, an unbiased and neutral fact finder. I was not the attorney of record at the hearing, but in reading the transcripts, what jumped out at me was the hostility of the immigration judge toward the petitioner throughout the hearing. The immigration judge's questioning was overly aggressive and unnecessarily hostile, and I believe this affected petitioner's ability to present her claim. At one point in the hearing, the immigration judge was aggressively questioning petitioner regarding her journalistic skills. Specifically, the immigration judge believed petitioner rusted judgment with her stories and went public with them without doing adequate research first. And petitioner, in response to this aggressive questioning, responded, I'm very tense. I can't concentrate. However, the immigration judge did not let up and demanded an answer. Was this issue raised before the BIA? I don't think it was. I don't think this neutrality question or aggressiveness was raised, in which case I don't believe we could consider it. I couldn't say for certain, Your Honor. I came in at the last minute for the ninth. No, I understand, but the prior attorney was actually disciplined by the bar after filing the ninth, so I came in at the last minute to write the brief. So I don't actually have a complete record. I don't even have a portion of the certified administrative record, so I couldn't say for certain, Your Honor. Well, but I don't see why you can't talk about something that jumps out at you from the page, because we're interested in the IJ's credibility finding, and that certainly would be a factor, I would think. I agree, Your Honor, and I do believe that this is clearly linked to the credibility. So you think your strongest argument in your view is the due process argument? I believe so, Your Honor. I do. And I believe that it directly correlates to the credibility, in that the judge found her not credible, but I believe she was, in fact, credible, and it was just the intimidation of the judge that prevented her from being able to explain herself, either because she was cut off when she tried to explain issues or she was intimidated to a point where she told the judge she can't concentrate and she couldn't answer the question because she was so scared. And then later, these issues were the issues the immigration judge found her not to be credible on. Well, on the record, if the immigration judge found her not credible, but the basis for an immigration judge who had prejudged the case and is partial, then we may be able to reverse and say that what she said was credible. Then you have the situation of is there enough for her to have relief if she was credible? Correct. Is that your position? That is my position, Your Honor. Okay. Well, then you have to think about whether some of those findings that involve credibility went to the heart of her case. That's correct, Your Honor, and whether or not it did affect her claim. In this case, the very issues that the judge found her not credible are the issues in which she was either cut off. There were certain points where she was trying to explain herself and the judge just cut her off and said, point blank, I don't want to hear that, and then later found her not credible on that very issue when she didn't even get an opportunity to explain herself. And then there were other points where she was just browbeating the Petitioner to the point where the Petitioner told her, I can't concentrate, and the judge is still demanding, give me an answer, give me an answer, and won't even give her a moment. Were you appointed by the court? I was not. She had come to me and I spoke to the court clerk and the court clerk strongly encouraged me, should I say, to please write the brief because it was about a month beyond the briefing schedule. So I went ahead and I agreed to do the brief. You're doing this pro bono, are you? It's not pro bono, Your Honor, but we did do it for a very low fee, shall we say. So I do apologize. I do not have a complete certified administrative record because the prior attorney sort of went out of business and took the entire file. So I do apologize for that, Your Honor. Let me ask you this question. What do you want us to do if we decide you're in favor? I would like her case to be remanded, preferably with a different immigration judge so she can just have an opportunity. In other words, you want another hearing. I do want another hearing. You're not saying we should give relief? You had a judge who didn't give you a fair shot, her credibility findings should be rejected. That's correct. You ought to have a chance to have a new hearing before another judge. That's correct, Your Honor. Okay. I did cite some other examples here. If you want to hear them, I pulled up a transcript that seemed a little surprising to me. Give us, like, your best example. Well, one that I found rather surprising, at one point the government attorney was asking Petitioner about treatment she had received for a head injury after she had been attacked. And the Petitioner didn't understand what the word treatment meant. And she asked for clarification of that word. And the judge literally snapped and said, what did the doctor do? Did he give you medicine? Did he pound your head and make it worse? And then at that point, the Petitioner was so taken back, she wasn't even sure how to answer. And that's just one example. If you read the transcript, you're going to see the judge continually snapping at her for her word choices. When she was Armenian, using a translator, and it's not even sure if it was her word, the translator's word, but the judge continually jumped on it for every word she chose. And the Petitioner was constantly on the defense of trying to explain what it meant by this word was this, this, and this. And then it completely got sidetracked from the story. And then in the end, the immigration judge found her not credible for issues that I believe, had she been given an opportunity to explain, would not have been an issue. And I found some other due process issues here. The immigration judge allowed the government attorney to read a portion of the asylum officer's notes into the record without presenting the asylum officer, not allowing the asylum officer to be cross-examined, and then accepted those notes as true facts. And I believe this goes against this Court's 2005 ruling in Singh v. Gonzales, which essentially said that it's improper for conclusory or short statements of asylum officer's notes to be read into the record without the asylum officer being presented for cross-examination. The Petitioner had no way of countering this. The immigration judge also didn't consider all the evidence. Petitioner tried to offer videocassette of one of her stories, the military hazing story that was a televised story. The immigration judge refused to accept the videotape, just simply saying the Court was not set up for it, and made no attempt to see if the Court could be accommodated, could accommodate her videocassette. And then the immigration judge later then found her not credible for presenting evidence regarding her stories. The immigration judge also discounted her medical certificate regarding her injuries that she sustained after an attack, saying that, well, if the Petitioner couldn't come up with her stories, her articles, then how could she come up with a medical certificate? But the Petitioner tried to explain, well, she left Armenia with the medical certificate, well, not the articles, and she had no family left in Armenia. Her entire family fled Armenia for Russia prior to her leaving, so she had no one to rely upon. But the immigration judge just decided that the medical certificate, under those circumstances, was not reliable and wouldn't consider it. And then the immigration judge pointed out that she provided a letter from her doctor regarding concussion, but there was no report concerning her statement that she'd been raped. Correct. The immigration judge did go off on the fact that she didn't provide any medical treatment about the rape. I believe she did provide an affidavit from her sister-in-law regarding her condition after the rape. Prior to the rape, the Petitioner had gone to the police station to report a ransacking of her office. When she went to the police station, one of the police officers pushed her up against the wall, tore up the paper, and threatened her. And then subsequently she was raped. So she raped being a very emotional and violent crime, and then having previously been attacked by a police officer in a police station, it seems more logical that  What did she say about that? About why she didn't come forward about the rape? Or whether she did. Well, she did eventually come forward about the rape. And the immigration judge's issue is why she didn't immediately disclose the rape. It was her issue. And she – I believe her reasoning was it was very traumatic for her, very emotional. It was very private. It was a hard thing for her to come out with, especially in the asylum interview with a male asylum officer. She had difficulty with that. But the immigration judge took difficulty with that whole issue. One of the other issues the immigration judge brought up was her press credentials. She doubted the authenticity of her press credentials because the photograph and the press credentials were similar to that of her asylum application. There were different poses, but the overall look was similar. But the Petitioner tried to explain that she always wore her hair the exact same way, and she wore very little clothing. I didn't understand that, I guess. She's saying if they don't look similar, then they get you. And now they're saying if they do look similar, they get you. So I'm kind of having – I was having a little trouble understanding the immigration judge's point. I understand. And I'm not – I'm not sure. I just know that the immigration judge found that they look similar, so therefore the press credential must be fabricated. But there was never any doubt that she worked for this journalist agency, right? Not that I'm aware, no. And – but I also noted in the brief that the passport and the visa stamp had the same, almost similar pictures, the same hairstyle, the same clothing as both the press credential and the asylum application. But those are not in question, the authenticity. The judge went on setting aside credibility, as she also said. Well, even if she's credible, there's no nexus between the persecution and the five statutory grounds. And I believe she falls under two grounds, social group as a journalist and imputed political opinion as a whistleblower. And I believe that the immigration judge's finding regarding nexus is clearly wrong. As Petitioner received clear threats that ordered her to stop her investigations and the attacks she suffered were accompanied by threats and comments about her work and were carried out by government officials, including members of the military and police officers. I had – I had just told you about the time she went to the police station to report a ransacking of her office, and she was attacked there in the police station by a police officer and threatened. Well, yeah. There's a whole host of incidents that took place. Well, your time's up. We don't set these times. They're sort of arbitrarily set by our clerk's office, who places an evaluation on the case just from the inventory. So anyway, I think you've covered everything. All right. I appreciate that. All right. Thank you. May it please the Court, my name is Cindy Farrier, and I'm here to represent the Attorney General in this matter. Just to note a little bit of the process of what occurs in asylum – for asylum seekers such as this particular petitioner affirmatively filed an asylum application with the Department of Homeland Security. She went in and had an interview on that particular application. In one-third of those cases, DHS grants the asylum applications. In the remaining two-thirds that they don't grant, they refer on to the immigration court, and there, the immigration court then gives them a full hearing. And from that point, if they are not granted asylum, they're able to appeal to the board. And in 38% of those cases, persons are granted asylum. So in this particular case – Before the IJs. Before the IJs and the board. The board's out of business. The board can still certainly remand cases back to the immigration judge if they feel that there's been a problem in granting asylum. This is just – I just wanted to give you a little bit of background in the sense that there are cases that are granted long before they get to this court. And there are a significant number of cases that are granted. But in this particular case, the immigration judge, upon hearing the testimony of the petitioner, felt as though something didn't gel. And she made that clear in her – during the hearing, that she felt as though there was something just not ringing true about the petitioner's testimony. The petitioner put herself out as a journalist who took pride in her journalistic work and who was trained as a journalist. So therefore, the judge was perhaps aggressive in asking the questions about the methods and the standards that she'd employed. But at the same time – You spoke of him. The petitioner is a woman. Am I right? Yes, I'm sorry. Or am I wrong? If I misspoke, I'm sorry. It is a woman. And the judge was also a woman. She claims to be raped. I guess a guy can be raped too, but – Yes, but this was a woman, yes. But the only thing I want to make clear is that the immigration judge was there and was observing the petitioner and was taking into account the background that she had from the asylum application and from the country reports and putting those all together and finding that something wasn't coming true. But you see, we have specific case law about telling us what isn't hanging together or gelling. And so my head was swimming with all the credibility or incredibility findings, and we've done quite a bit of work to list all these out. Let me just give you an example, which stops me kind of cold. The judge says, well, I think it's implausible that if this guy is holding a knife to her throat and threatening her and might rape her, that she would black out. I suppose if there were medical evidence that says people who are about to be raped don't black out, they run out, that would be one thing. But it seems to me that is just the kind of speculation that we're told in our case law that the immigration judge shouldn't engage in. Well, the immigration judge did make that statement after hearing the rest of the testimony, and I guess had, according to her decision, felt that there were portions of the petitioner's testimony that were quite detailed and that there were portions that were not, and that this particular aspect she thought that there should have been more detail about. Well, but the fact that the findings she made was it just seemed implausible that she would black out. I mean, how? So, you know, I say, okay, well, to be honest, just so you know where I stand, like on that point, it seems there's just no evidence in the record that would suggest that that's an implausibility. Well, in this -- Why don't you, because there's so many findings, why don't you tell me what credibility findings you think are strongest, or I say findings of lack of credibility, it should be more precise, that you think are strongest here? Well, this is a case where the immigration judge doesn't point to specific inconsistencies necessarily between aspects of the testimony. In fact, she states that she thinks that it is a fairly consistent story that the petitioner tells from the asylum application all the way through the hearing, but that perhaps there's embellishments. And in particular, she pointed out things such as the asylum application where the petitioner said that she conducted substantial research regarding the orphanage article and then met with the orphanage director. When in testimony it came out that actually she hadn't conducted this significant research. Now, while this may seem minor in and of itself, that in conjunction with the fact that she wasn't able to specify, well, also that she, I guess I should say- Well, but I mean, it seems to me like this is the orphanage, this is when she did her story on the orphanage. But she talked to somebody. I mean, take a look at the New York Times. They just, you know, copied from the AP or whatever. She talked to somebody. She went and talked to the principal. She interviewed a teacher. See, that's where I'm, again, that's a good example. The funds that came in. So it's a question of, you know what, I think you're not quite good enough as an investigative journalist. You didn't do quite enough research. I'm thinking, well, what does that have to do with- Well, actually, that is one of the problems that the immigration judge sees in that she didn't actually submit that particular article. She left Armenia quickly. She had some materials, but she didn't have, like, a whole office full. But as a journalist, the immigration judge could reasonably infer that she would have access to all of her articles. And if she did not, she stated that she still had some friends that still worked in journalism there that potentially could have gotten her those documents. But, you see, that's the kind of speculation that the judge isn't supposed to be engaged in. I mean, it's not a question of whether she brought a computer disk or whether she was even using a computer or whether she had Internet access in Armenia. You have the immigration judge imagining, you know, what it's like to be a journalist in the U.S. and then transferring that to what it's like to be a journalist in Armenia. So is that-I guess I take from your answer is that there's no single thing that stands out as a finding of lack of credibility, but your view is that all these little things add up to enough. Yes. Okay. And it's within making that finding then that it was reasonable for the immigration judge to note the lack of corroboration, and that would be the lack of the article which supposedly brought this about, the orphanage article, the lack of the medical documentation or police report of the rape. The fact that there's no affidavits- When did you get a police report of the rape? Do you think they did a police report of the rape when the police were the rapists? Well, in that particular instance, she didn't claim that it was the police officer that was raping her. She said that it was the military officer. And assuming that they were distinct agencies, the police from the military, that they would have-she would have been able to make a police report. But if not, at least at the very least, the immigration judge reasonably took note of the fact that she didn't submit an affidavit either from any of her colleagues or from her sister-in-law that she was living with at the time to support this. And again, it all sort of comes back to the fact that this was a journalist. She was a journalist, and therefore, she knows what it takes to back up a story. And essentially, the immigration judge felt that she didn't do it here. And just with regard to the point of due process and being allowed to submit a videocassette of the military hazing incident, the record doesn't contain any evidence that there was a videocassette that the petitioner was trying to present. She did reference throughout several times in her testimony a cassette which she wished to present, but it wasn't made clear what that cassette had. The immigration judge just simply noted or stated to her that they had already determined that that wasn't going to be admissible and appears to say that it was much that the cassette was containing information that was much larger than more general or general conditions rather than a specific claim. And that's what the immigration judge does throughout the proceeding is try and hone the petitioner's claim to what is specific to her. What did she say about the cassette? Don't forget, this is all done through an interpreter, right? Yes, she did have an interpreter, yes. Well, at one point in the... Did something about the fact that this is not... Well, at one point... Theater or something like that. At 114 in the record, page 114 from what I have written here, the petitioner had said, I beg you to look at the cassette related... What I thought from reading the transcript was related to the school story, the orphanage story, not the military hazing story. And the immigration judge indicated that they had spoken about the tape, but that she determined that it was not relevant as evidence. But see, there would be a good example if the cassette is about the orphanage story and one of the problems with her credibility is she didn't come up with the orphanage story, but now they won't let her even show the videotape. How does that square with the finding of lack of credibility as not providing the actual story? Well, again, in bringing it up, I'm trying to point out the fact that it's not clear from the record the basis exactly for why the IJ didn't allow it. I think it's also quite true that the immigration court facilities are not set up to facilitate the playing of a tape cassette as evidence. What did the immigration judge say when she denied that request? It sounded as though she said that she was only able to hear evidence related to her asylum application and not evidence related to general conditions of schools in Armenia. Does she say something about this? We're not running a theater here. She does say that this is not for propaganda purposes because at a certain point the petitioner had indicated, I sent this cassette over to the U.S. to play to show how journalists are being mistreated in Armenia. And again, this is all what I'm extrapolating from the record. My point, actually, in bringing this up is that if there is a due process concern about this, it should have been raised before the board because that is precisely the sort of thing that the board could have taken notice of and corrected. So for any due process claims, they were not raised before the board. And those are claims which they could have corrected, and so therefore the court should not consider them in the first instance since they haven't been exhausted. Can I ask you a procedural question? Sure. I read the IJ's findings, and it's a rambling 43-page listing of what she's finding. It almost seems as though she's getting herself wound up. The further she went, it must have taken an hour or more to dictate these. Is that usual that we have findings by the immigration judge that are oral? Well, it seems to me that most of them are shorter, more specific, and written. Actually, no. Most of them are, in fact, oral decisions. There is the judges are they have a very full docket. I know that. And they are responsible for it. So they finish up and they. . . Yeah, most often. . . That's what I wanted to know. Thank you. And, yes, this is quite a long one, though. I don't think I've seen one that's quite this long. Neither have I. If there are no further questions. Thank you. Just give me a minute to respond. I got moved along. Okay. I was just going to answer the Honor's question. I have actually been in front of this judge a number of times, and that is actually a very typical oral decision for her, where it just goes on and on and around and around. And that's what they do. Yeah. I don't have much more to add, but to say that the government attorney went on to give statistics about number of asylum applications approved, but I think what you have to look at is the individual judge's percentage. And what's at issue here is this specific judge and her demeanor and her behavior in a courtroom and how she treats asylum applicants. You say you've been before. I have been before her a number of times. Would you be comfortable if we remanded to her with orders to make specific findings, or are you not satisfied with it? I'm ‑‑ this judge has a particular reputation of being very aggressive toward, well, more so toward the alien than the attorney. And I am afraid that she may still be a bit aggressive toward the petitioner who's been through a lot already. Okay. I just want to hear. Okay. I really don't have anything further to add other than to rehash. So I don't want to waste your time.
judges: Bright, Pregerson, McKeown